UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GREGORY GARVEY, ET AL., )
        Plaintiffs )
)
)
)
)
      v. )   Civil Action No. 07-30049-KPN
)
)
)
FREDERICK MACDONALD and )
FORBES BYRON, )
        Defendants )

MEMORANDUM AND ORDER WITH REGARD TO CROSS-MOTIONS
FOR SUMMARY JUDGMENT (Document Nos. 31 and 37)
October 22, 2009

NEIMAN, U.S.M.J.

Presently before the court are cross-motions for summary judgment in this class action "strip search" case brought by Gregory Garvey ("Garvey") and other similarly-situated pre-arraignment detainees ("Plaintiffs") at the now-closed Franklin County Jail ("FCJ") in Greenfield, Massachusetts. The class this court certified on April 15, 2008, consists of the following:

> All people strip searched without individualized suspicion on or after March 28, 2004, and before February 25, 2007, at the [FCJ] (a) while waiting for bail to be set or for a first court appearance after being arrested on charges that did not involve a weapon, drugs, contraband or a violent felony, or (b) while waiting for a first court appearance after being arrested on a default or other warrant for charges that did not involve a weapon, drugs, contraband or a violent felony.

(Docket No. 18 and Electronic Order dated Apr. 15, 2008.) Plaintiffs and Defendants --

Sheriff Frederick Macdonald and Special Sheriff Forbes Byron, both of whom have

been sued in their individual capacities -- have consented to the jurisdiction of this court pursuant to 28 U.S.C. § 636(c).

For the reasons that follow, Plaintiffs' motion for summary judgment will be allowed and Defendants' cross-motion will be denied. There are two questions at issue in the cross-motions: (1) whether the strip-search policy in place at the FCJ during the class period was unconstitutional; and (2) even if the policy was unconstitutional, whether qualified immunity bars this action against Defendants. In the court's opinion, the answer to the first question is "yes" while the answer to the second is "no."

## I. BACKGROUND

In presenting this background, the court has focused solely on the undisputed facts submitted by the parties. *See Littlefield v. Acadia Ins. Co.*, 392 F.3d 1, 6 (1st Cir. 2004) ("Cross motions simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed.") (citation and internal quotation marks omitted). The court begins with Plaintiffs' facts, turns to Defendants' facts and then describes the procedural history.

A. Plaintiffs' Facts

At around 11:00 p.m. on January 30, 2007, police officers from Sunderland, Massachusetts, came to Garvey's home and arrested him on a default warrant for failure to appear in court on the charge of operating on a suspended driver's license. (Pls.' Local Rule 56.1 Statement (hereinafter "Pls.' Facts") ¶ 25.) The officers took Garvey to the FCJ to be held until he could appear in court the next morning. (*Id.* ¶ 26.)

At the time of Garvey's arrest, police departments throughout Franklin County regularly brought arrestees and individuals arrested on default or other warrants (collectively, "pre-arraignment detainees") to the FCJ to be held before their first court appearance. (*Id.* ¶ 5.) The facility, however, also housed detainees being held pending trial ("pretrial detainees") as well as prisoners serving committed sentences. (*Id.* ¶ 6.)

When Garvey arrived at the FCJ, a correctional officer placed him in a cell by himself in the booking area. (*Id.* ¶ 26.) Next, another officer entered the cell and ordered him to take off all his clothes. (*Id.* ¶ 27.) When Garvey was completely naked, the officer said: "We have to watch you do it. Bend over. Spread your cheeks." (*Id.*) Garvey did as he was told and the officer looked at his naked body, including his genitals. (*Id.*) There was no reason for the officer to believe Garvey had hidden contraband, and none was found during the strip-search. (*Id.* ¶ 33.)[1]

After the search, the officer ordered Garvey to dress in a jail jump suit and leave the cell for booking. (*Id.* ¶¶ 28, 29.) The booking officer then asked Garvey questions and took his photograph, after which another officer put him back in the same cell in the booking area. (*Id.* ¶ 29.) Garvey remained in that cell by himself until morning. (*Id.*)

At around 7:00 a.m., an officer came into Garvey's cell and ordered him to

---

[1] The First Circuit defines a "strip-search" as a visual inspection of an inmate's naked body, and a "visual body cavity search" as a strip-search that includes the visual inspection of an inmate's anal and genital areas. *See Blackburn v. Snow*, 771 F.2d 556, 561 n.3 (1st Cir. 1985). Here, the parties use only the term "strip-search" to describe the searches at issue and, accordingly, the court does likewise, even though the searches were more akin to the more intrusive visual body cavity searches.

3

remove the jump suit and his underwear. (*Id.* ¶ 31.) Once again, when Garvey was completely naked, the officer ordered him to bend over and spread his buttocks and then the officer looked at his naked body, including his genitals. (*Id.*) As before, there was no reason to believe Garvey had hidden contraband and none was found. (*Id.* ¶ 33.) After the strip-search, Garvey was allowed to put on his clothing. (*Id.* ¶ 31.)

Soon thereafter, Garvey was chained to other prisoners and taken to the Greenfield District Court. (*Id.* ¶ 32.) This was the first time he came in contact with any other prisoner. (*Id.*) When Garvey appeared in court, the judge dismissed the charges and released him from custody. (*Id.* ¶ 34.)

Garvey's experience was typical of other pre-arraignment detainees at the FCJ during the class period, as well as in conformance with the FCJ's policy and practice. (*Id.* ¶¶ 11, 35.) Defendants' policy and practice at the time -- specifically section .05 of "General Order 506," which was adopted on October 5, 2001, and reissued on October 18, 2005 -- required that correctional officers strip-search all pre-arraignment detainees both at the time of admission to the jail (prior to booking) and then again before leaving for a first court appearance, with the sole exception of those people who were held in protective custody. (*Id.* ¶¶ 4, 10.)[2]

---

[2] In full, section .05 of General Order 506 provided as follows:

1. Inmates shall be strip searched in the following instances:

    a. prior to and at the conclusion of a transportation trip;

    b. return from escape or attempted escape;

    c. after visitation;

4

Pursuant to Defendants' policy and practice, all pre-arraignment detainees were strip-searched without regard to where in the facility they would be housed or whether they would come into contact with other inmates. (*Id.* ¶ 14.) In addition, all pre-

---

       d. after return to the facility from temporary release; and

       e. prior to placement in a segregation or other maximum-security unit.

2. All admissions to the facility (with the exception of Protective Custody detainees) shall be strip searched at the time of admission.

3. Protective Custody detainees, under an Officer's supervision, shall be required to remove all outer garments and change into the standard issued uniform. The Officer supervising this procedure shall be of the same gender as the detainee.

4. Officers may, at any time, order the strip search of an inmate. The Office of Sheriff may, through General Orders, Directives and Post Orders, require strip searches in other situations.

5. Strip searches shall be conducted in relative privacy by Officers of the same gender as the inmate.

6. The Officer conducting the search shall direct the inmate to remove all articles of clothing and to stand clear of the clothing. The Officer shall conduct a thorough visual examination of the unclothed inmate in accordance with his/her training and experience. Examination shall be made of casts, bandages, false teeth and artificial prostheses. The Officer shall issue verbal instructions to facilitate the search. The Officer shall examine the inmate's clothing by turning the articles inside out, checking linings, cuffs, waistbands, seams, patches and collars. The soles, heels and interior of footwear shall be checked.

When more than one inmate is being strip searched (e.g. at the end of a visiting period or return from outside transportation) the supervising Officer shall ensure that those inmates who have been searched do not come in contact with those inmates who have not yet been searched.

(Document no. 34 ("Milton Decl."), Exs. G and H.)

arraignment detainees were strip-searched without regard to the crimes for which they were being held or whether they were individually suspected of carrying weapons, drugs or other contraband.  (*Id.* ¶ 13.[3])

Approximately 927 people were held as pre-arraignment detainees during the class period.  (*Id.* ¶ 15.)  In only one instance were drugs found as a result of a strip-search; that individual, however, had been brought in for possession of drugs with intent to distribute and is not part of the class in this case.  (*Id.* ¶ 17.)  In another instance, a strip-search revealed "contraband," namely, pierced nipple rings fused together such that they could not be removed by hand.  (*Id.*)  In no other instance during the class period was a strip-search necessary to reveal drugs or contraband.  (*Id.* ¶ 18.)  On three occasions drugs were found in a pre-arraignment detainee's clothing or backpack during the booking process; these drugs would have been found without subjecting the individual to a strip-search.  (*Id.*)

Macdonald has been the Franklin County Sheriff since 1993.  (*Id.* ¶ 1.)  As the top official in the Sheriff's Office, he has statutory control and responsibility, and is the final policymaker, for the FCJ.  (*Id.*)  He is also responsible for ensuring that the

---

[3] This particular practice is purportedly "disputed" by Defendants, who claim that the documents Plaintiffs reference in this regard do not explicitly state that this was the policy of the FCJ.  (See Defs.' Facts at 6, ¶ 13.)  As Plaintiffs point out, however, Defendants never deny the allegation, *i.e.*, that the strip-search policy applied to all pre-arraignment detainees without regard to the crimes for which they were being held or whether they were individually suspected of carrying weapons, drugs or other contraband.  (See Pls.' Reply Mem. in Further Support of Pls.' Motion for Summ. J. ("Pls.' Reply") at 2.)  Moreover, the practice described by Plaintiffs comports with Defendants' other admissions, *e.g.*, that they maintained a policy throughout the class period of subjecting all pre-arraignment detainees to a strip-search and that all pre-arraignment detainees were strip-searched pursuant to this policy.  (See *id.*)

policies of the FCJ comply with the Constitution. (*Id.*) As for Byron, he has been Superintendent of the FCJ since 1997. (*Id.* ¶ 2.) He is the chief administrative officer of the Sheriff's Office and is in charge of operations at the FCJ. (*Id.*)

It is undisputed that Macdonald issued and Byron implemented General Order 506 which, as indicated, contained the written version of the strip-search policy that was in place throughout the class period. (*Id.* ¶ 3.) It is also undisputed that Byron reviewed and supported the policy before it took effect. (*Id.*)

B.  Defendants' Facts

For their part, Defendants point out that the FCJ was constructed in 1886 and was originally built to house 66 prisoners, but, together with a 60-prisoner modular addition, eventually had a rated capacity of 126 prisoners. (Defs.' Local Rule 56.1 Statement (hereinafter "Defs.' Facts") ¶ 1; Pls.' Response to Defs.' Local Rule 56.1 Statement (hereinafter "Pls.' Response") ¶ 1.) Defendants also aver that, during the class period, the FCJ served as the sole jail and house of correction in Franklin County. (Defs.' Facts ¶ 2; Pls.' Response ¶ 2.) In addition, Defendants state that the FCJ was used by most of the police departments in rural Franklin County to hold pre-arraignment detainees pursuant to Mass. Gen. L. ch. 126, § 4 ("section 4"), as most local departments had no specific holding facilities of their own. (Defs.' Facts ¶ 13.)[4]

---

[4] Section 4, as Defendants point out, permits jails to hold pre-arraignment detainees where local lockups are unavailable:

> Jails shall be used for the detention of persons charged with crime and committed for trial, committed to secure their attendance as witnesses upon the trial of criminal causes, committed pursuant to a sentence upon conviction of crime or for any cause authorized by law, or detained or

On February 26, 2007, the new Franklin County House of Correction ("FCHOC") opened and replaced the FCJ. (*Id.* ¶ 3.) While the new FCHOC was built in the modern "pod" style (two tiers of cells positioned within the perimeter of a common dayroom, which allows direct supervision of all cells), the FJC had been built in the "linear" style (cells lining corridors offering only indirect surveillance). (*Id.* ¶ 5.) In addition, the cells in the FCJ were 48 square feet, compared to 80 square feet at the new FCHOC. (*Id.* ¶ 6.)

As noted, Macdonald adopted the blanket strip-search policy for all pre-arraignment detainees well prior to the class-period. (*Id.* ¶ 14.) Defendants claim, however, that this was as a result of "institutional security issues" caused by the "archaic nature" of the FCJ and, moreover, that the policy was "intended to protect the safety of both the inmates and the correctional officers." (*Id.*) For example, Defendants point out that three cells were used to handle pre-arraignment detainees within the "extremely tight" booking area (constructed in 1994), which also included a booking desk. (*Id.* ¶¶ 7, 9; Pls.' Response ¶ 9.) Defendants also indicate that, occasionally, pre-arraignment detainees were held in the booking area "overnight." (Defs.' Facts ¶ 11.) Defendants state as well that most of the cells in the FCJ had bars -- instead of

---

      committed by the courts of the United States. Jails may also be used for
      the detention of persons arrested without a warrant and not admitted to
      bail pending appearance before the district court, provided that no
      adequately equipped lock-up established in accordance with the
      provisions of section thirty-four of chapter forty is available for the
      detention of such person.

Mass. Gen. L. ch. 126, § 4.

metal doors with windows as in the new facility -- and, as a result, prisoners could reach out from the cells and, perhaps, pass around contraband. (*Id.* ¶ 6.) Although Defendants admit that the record does not indicate a major contraband problem, they refer to the handful of instances -- noted above in Plaintiffs' Facts -- of contraband being confiscated from pre-arraignment detainees during the class period. (*Id.* ¶¶ 24-28.) Defendants also claim that contraband confiscated from detainees was not always documented or reported by correctional officers as required by policy. (*Id.* ¶¶ 25-27.)

While Plaintiffs take issue with Defendants' characterizations of some of the facts, they assume them true for purposes of their motion. Plaintiffs note, however, that the blanket strip-search policy was changed to a "reasonable suspicion" standard when the new FCHOC opened in 2007. (*Id.* ¶ 20; Pls.' Response ¶¶ 14, 20.) Plaintiffs also note that as early as November 29,1999 -- *i.e.*, nearly five years prior to the class period -- the FCJ policy was temporarily changed from the blanket strip-search policy to a "reasonable suspicion" standard. (Defs.' Facts ¶ 15; Pls.' Response ¶ 20.)[5] However, this altered policy was short-lived; on December 3, 1999, Macdonald changed the policy back to require strip-searches of all pre-arraignment detainees, and that was the policy in place during the class period. (Defs.' Facts ¶ 17.)

C. Procedural History

The instant case was filed on March 28, 2007, and proceeded in two stages. First, the parties engaged in class certification discovery and filed memoranda of law

---

[5] At his deposition, Macdonald testified that he adopted the temporary policy change to avoid getting sued and because he thought it might be required by law. (Pls.' Response ¶ 15.)

with regard to Plaintiffs' motion for class certification. As indicated, that motion was allowed on April 15, 2008. Second, the parties engaged in discovery on the merits and filed the cross-motions for summary judgment presently before the court.

## II. STANDARD OF REVIEW

"Summary judgment is warranted 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Uncle Henry's, Inc. v. Plaut Consulting Co.*, 399 F.3d 33, 41 (1st Cir. 2005) (quoting Fed. R. Civ. Pro. 56(c). "An issue is 'genuine' for purposes of summary judgment if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a 'material fact' is one which might affect the outcome of the suit under the governing law." *Carcieri v. Norton*, 398 F.3d 22, 29 (1st Cir. 2005) (citations and further internal quotation marks omitted). The mere fact that both parties move for summary judgment does not affect this standard, *see Alliance of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30, 34 (1st Cir. 2005) (citation omitted)), particularly where, as here, most of the facts are undisputed, *Littlefield*, 392 F.3d at 6.

## III. DISCUSSION

As indicated, two questions are at the core of the parties' motions: (1) whether the strip-search policy was unconstitutional and (2) even if the policy was unconstitutional, whether qualified immunity bars this action against Defendants. In the court's opinion, the answer to the first question is "yes," the policy was unconstitutional, and the answer to the second question is "no," Defendants are not protected by

qualified immunity.

A. <u>Whether the Policy is Unconstitutional</u>

The general rule in this circuit appears to now be that strip-searches of all misdemeanor arrestees require reasonable suspicion that the individual is armed or concealing contraband. *See United States v. Barnes*, 506 F.3d 58, 62 (1st Cir. 2007) (citing cases). *See also Wood v. Hancock County Sheriff's Dep't*, 354 F.3d 57, 62 (1st Cir. 2003) ("Our case law holds that an individual detained on a misdemeanor charge may be strip searched as part of the booking process only if officers have reasonable suspicion that he is either armed or carrying contraband."); *Roberts v. Rhode Island*, 239 F.3d 107, 110-11 (1st Cir. 2001) ("at least in the context of prisoners held in local jails for minor offenses," officers must "have a reasonable suspicion that a particular detainee harbors contraband prior to conducting a strip or visual body cavity search") (citing *Bell v. Wolfish*, 441 U.S. 520 (1979), and *Swain v. Spinney*, 117 F.3d 1, 7 (1st Cir. 1997)). The need for reasonable suspicion stems from the recognition by the First Circuit that strip-searches "impinge seriously upon Fourth Amendment values," are "a severe if not gross interference with a person's privacy," and are "an offense to the dignity of the individual" as well as "an extreme intrusion on personal privacy." *Roberts*, 239 F.3d at 110 (citations and internal quotation marks omitted).

Defendants do not claim, nor is there any evidence, that the strip-searches of the class members were conducted based on any reasonable, individualized suspicion. Nor is there any claim or evidence that any class member was armed or suspected of concealing contraband. As noted, the class has been narrowly defined to include only

pre-arraignment detainees arrested on charges that did not involve a weapon, drugs, contraband or a violent felony.

In the court's view, the handful of "problem" detainees identified through discovery have no bearing on the legal issues presented by the parties. These detainees consist of only (1) three individuals upon whom drugs were found without the need for a strip-search, (2) one individual with exceptionally unique, and minor, "contraband," *i.e.*, fused nipple rings, and (3) one other individual who had smuggled drugs on his body but who is not a member of the class. Even assuming that there may have been other "undocumented" problems with contraband, as Defendants suggest, Defendants admit that there were no major reported contraband problems. Accordingly, the searches seem to be clearly unconstitutional under established First Circuit precedent.

To be sure, it appears that *blanket* strip-search policies may be deemed constitutional in this circuit if there are "compelling" institutional concerns. *See Roberts*, 239 F.3d at 110-11. Defendants make that assertion here, pointing to the following concerns: institutional security issues; the condition of the booking area; the contraband issues; intermingling; overcapacity issues; the multipurpose FCJ facility; the unavailability of alternatives for housing pre-arraignment detainees; and the interplay between section 4 and the lack of local lockups in rural Franklin County. As Plaintiffs point out, however, Defendants "concerns," in fact, are far weaker than those the First Circuit itself rejected in *Roberts*. *Id.* at 112 (finding unconstitutional the strip-searching of all pre-arraignment detainees charged with misdemeanors not associated

with weapons or contraband, even though detainees were held in a maximum security facility -- with a lengthy, documented history of contraband -- and freely intermingled with the general prison population). Moreover, as *Roberts* explained, "[a]n indiscriminate strip search policy routinely applied . . . can not be justified simply on the basis of administrative ease in attending to security concerns." *Id.* at 113 (citation and internal quotation marks omitted).

It should also be noted that several of Defendants' concerns have little or no factual support or are simply irrelevant. For example, the so-called "contraband" problems, as indicated, are exceedingly small in number and easily distinguishable. Similarly, although Defendants consistently refer to the booking area as being "extremely tight," Defendants have not offered evidence of a single incident between 1994, when the booking area was constructed, and 2007, when the FCHOC opened, in which an inmate ever "reach[ed] over to the booking desk and grab[bed] whatever items were placed on the desk." (Defs.' Facts ¶ 9.) Thus, it is of no moment that there were occasional instances of pre-arraignment detainees being held in the booking area "overnight."[6] It is also immaterial that section 4 permitted the FCJ to house pre-arraignment detainees alongside other inmates; as noted, such intermingling concerns, standing alone, have not caused the First Circuit to condone a blanket strip-search policy. *See, e.g., Roberts*, 239 F.3d at 110-11.

---

[6] In any event, as Plaintiffs point out, on only about one percent of the class period days were there more than five pre-arraignment detainees. (Pls.' Response ¶ 11.) To be sure, Defendants note that two of the five booking area cells were used to store records. (Defs.' Facts ¶¶ 7, 8.) But there is no evidence that these records could not have been stored elsewhere. (See Pls.' Response ¶ 8.)

Finally, Defendants' argument that *Gilanian v. City of Boston*, 431 F. Supp. 2d 172 (D. Mass. 2006), represented a "sharp turn" in this district's strip-search law is misplaced. First, Defendants' argument to the contrary, *Gilanian* explicitly relied on *Roberts* in describing the framework for analyzing blanket strip-search policies (*id.* at 176); thus, Defendants' reference to "*Gilanian* factors" is puzzling. Second, *Gilanian* involved the denial of summary judgment to a plaintiff who was strip-searched while being detained on charges of assault with a dangerous weapon, a violent felony. The instant class excludes those charged with violent felonies or any crimes associated with weapons or contraband.

As a result, the first question raised by the parties is easy to answer in the affirmative given the undisputed fact that all pre-arraignment detainees were strip-searched without regard to: where in the facility they would be housed; whether they would come into contact with other inmates; the crimes for which they were being held; or whether they were individually suspected of carrying weapons, drugs, or other contraband. In short, the FCJ strip-searches were unconstitutional when applied to the class. Accordingly, the court turns to the second question addressed by the parties, qualified immunity.

B. <u>Whether Defendants are Entitled to Qualified Immunity</u>

The answer to the qualified immunity question also favors Plaintiffs. To set the stage, the court first quotes liberally from District Judge Richard G. Stearns' opinion in *DeToledo v. County of Suffolk*, 379 F. Supp. 2d 138 (D. Mass. 2005), itself a strip-search case:

14

> Qualified immunity attaches to discretionary conduct of government officials that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "[T]he qualified immunity inquiry . . . allows . . . for the inevitable reality that 'law enforcement officials will in some cases reasonably but mistakenly conclude that [their conduct] is [constitutional], and . . . that . . . those officials like other officials who act in ways they reasonably believe to be lawful -- should not be held personally liable.'" *Hegarty v. Somerset County*, 53 F.3d 1367, 1373 (1st Cir. 1995), quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).  "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'"  *Rivera v. Murphy*, 979 F.2d 259, 263 (1st Cir. 1992), quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (*per curiam*).
>
> In deciding whether qualified immunity attaches, "a court must first determine whether the plaintiff has alleged [the] deprivation of an actual constitutional right at all." *Conn v. Gabbert*, 526 U.S. 286, 290 (1999).  Stated more formally, the "threshold" question is this:  "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? . . . If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  Only if a violation of a right is found does the court proceed to answer the two remaining questions:  was the right clearly established when the plaintiff suffered the constitutional injury; and if so, "whether a reasonable prison official, situated similarly to the defendants, would have understood at the time that the policy in place . . . transgressed the Constitution."[7]  *Savard*

---

[7] As Judge Stearns pointed out:

"The right in question, . . . cannot be simply a generalized right, like the right to due process. . . .  It must be clearly established in a 'particularized' sense, so that 'the contours of the right' are clear enough for any reasonable official in the defendant's position to know that what

*v. Rhode Island*, 338 F.3d 23, 27 (1st Cir. 2003).

*DeToledo*, 379 F. Supp. 2d at 146-47.  To summarize, courts in strip-search cases follow the familiar three-part qualified immunity inquiry:  (1) have the plaintiffs alleged a deprivation of an actual constitutional right; (2) was the right clearly established when the plaintiffs suffered the constitutional injury; and (3) if so, would a reasonable prison official, situated similarly to the defendants, have understood at the time that the policy in place transgressed the Constitution.  *Id.* at 147 (citing, *inter alia*, *Saucier*, 533 U.S. at 210).  *See also Pearson v. Callahan*, 129 S. Ct. 808, 818 (Jan. 21, 2009) (affirming the "beneficial" and "appropriate" *Saucier* sequential analysis for most qualified immunity cases).

Here, Plaintiffs have satisfied the first step in the sequential analysis.  Not only have they alleged but they have shown that Defendants' blanket strip-search policy at the FCJ during the class period, implemented without individualized, reasonable suspicion, was unconstitutional, *i.e.*, it deprived Plaintiffs of their Fourth Amendment right to be free from unreasonable searches.  *See also id.* ("Courts share the

---

the official is doing violates that right." *Danese v. Asman*, 875 F.2d 1239, 1242 (6th Cir. 1989).  As a rule, a right is "clearly established" when it is enunciated by a court of controlling authority in the defendant's jurisdiction in a case sufficiently similar in its facts "*that a reasonable officer could not have believed that his actions were lawful.*" *Wilson v. Layne*, 526 U.S. 603, 617 (1999).  *See also Starlight Sugar, Inc. v. Soto*, 253 F.3d 137, 144-145 (1st Cir. 2001) (relevant state, as well as federal decisions should be considered).  While "general statements of the law are not inherently incapable of giving fair and clear warning," they do so only if their application to a specific set of facts is clear.  *United States v. Lanier*, 520 U.S. 259, 271 (1997).

*DeToledo*, 379 F. Supp. 2d at 147 n.14.

16

consensus view that a strip and visual body cavity search is a severe and degrading intrusion into personal privacy and bodily integrity, and if conducted without some reasonable basis, violates the Fourth Amendment.") (citing *Roberts*, 239 F.3d at 110, 113).

Plaintiffs have also satisfied the second question in the sequential analysis, namely, that their rights to be free of a suspicionless strip-search were clearly established on March 28, 2004. *See id.* In fact, in *Ford v. Suffolk County*, 154 F. Supp. 2d 131 (D. Mass. 2001), a case challenging a similar strip-search policy, District Judge Nancy Gertner concluded that the right to be free of such searches was clearly established on *June 25, 1997*, when the First Circuit in *Swain* held that a strip-search of an arrestee "ordinarily" requires a reasonable suspicion that the arrestee is concealing contraband, weapons, or evidence on her person. *See DeToledo*, 379 F. Supp. 2d at 147. To be sure, the question of whether "*Swain* settled the strip search issue in this Circuit with respect to pretrial detainees, as Judge Gertner thought in *Ford*, [was] thrown into doubt by subsequent First Circuit cases." *Id.* at 148. But, for the reasons which follow, that question appears to have been resolved, at least with regard to the instant class.

In *DeToledo*, upon which Defendants rely, the issue was whether, as of *July of 1998*, a reasonable corrections officer would have known that conducting a strip search of a nonviolent felony arrestee pursuant to a longstanding institutional policy would violate the Constitution. *Id.* at 149. Although Judge Stearns observed that a reasonable corrections officer would not then have had such knowledge, he suggested

that the result would have been different if the defendants were higher-ranking officials responsible for setting policy. See id. at 149 & n.16. Thus, Defendants' argument to the contrary, *DeToledo* actually strengthens Plaintiffs' position here. Since the law was likely clearly established in 1998 with respect to policy-setting officials, Defendants, being the very type officials cited by Judge Stearns, have no grounds upon which to argue that, based on *DeToledo*, they were qualifiedly immune in 2004, six years later.

Nor can Defendants rely on District Judge George O'Toole's decision in *Doe v. Preston*, 472 F. Supp. 2d 16 (D. Mass. 2007), which granted qualified immunity to officials of a juvenile youth facility. That case was admittedly unique; it involved the novel "question of routine, suspiciousless strip searches of juveniles committed to state custody," for whom the state acts in *loco parentis*, not the more common strip-searches of adults "recently arrested for relatively minor offenses who are held in temporary detention facilities housing persons unlikely to have any incentive or opportunity to smuggle contraband into the facility, *see Roberts*, 239 F.3d at 107, *and Swain*, 117 F.3d 1." *Doe*, 472 F. Supp. 2d at 25, 27. Further, the time period at issue in *Doe* was "late 2002 and the first quarter of 2003," *id.* at 25, a full year prior to the beginning of the class period here.

True, in *Savard*, which was decided on August 4, 2003, the *en banc* First Circuit, by a split 4-4 vote, allowed certain prison officials to receive qualified immunity for similar blanket strip-searches prior to *March 17, 2000* (the last date the policy there was in effect). But even those judges who invoked the immunity clearly stated that such a strip-search policy "is *now* dead and buried." *Id.*, 338 F.3d at 33 (emphasis

18

added). Accordingly, the measuring date of *August 4, 2003*, is firmly established for qualified immunity purposes here.

In sum, the court agrees with Plaintiffs that the third question in the sequential analysis has been satisfied, *i.e.*, that any reasonable corrections official similarly situated to Defendants by *March 28, 2004*, the beginning of the class period here, should have known that a policy of strip-searching all pre-arraignment detainees such as those in the instant class, was unconstitutional. As a result, Defendants are not entitled to qualified immunity.

## IV. CONCLUSION

This case has brought to light an unfortunate policy at the now-retired FCJ, that of unconstitutionally strip-searching all pre-arraignment detainees charged with minor offenses not involving weapons or contraband between March 28, 2004, and February 25, 2007, a policy for which Defendants are not entitled to qualified immunity. For the reasons stated, Plaintiffs' motion for summary judgment is ALLOWED and Defendants' cross-motion for summary judgment is DENIED. The clerk is instructed to set this matter down for a case management conference so as to discuss further proceedings.

IT IS SO ORDERED.

DATED: October 22, 2009

      /s/ Kenneth P. Neiman
KENNETH P. NEIMAN
U.S. Magistrate Judge